Good morning, Your Honors. Charles Zabrith on behalf of the appellants Esebag and Whaley. I'd like to reserve five minutes for rebuttal. Enforcement of contracts according to their terms serves a very important function in our system. Enforcement of contracts according to its terms preserves and protects and promotes reliability and stability in commercial dealings. So counsel, I think we would agree with all of that and that's why your client got a jury trial because we do believe in the enforcement of contracts. Now you've had a jury trial. Your client was not successful. I mean, you're up on a pretty difficult standard that you've had. There was no evidence at all to support the jury's verdict. No substantial evidence, Your Honor, but we also believe that there were legal issues. The point I was trying to make here is that the law in service of the principle of enforcement of contracts binds parties to their representations and obligations. Again, we don't have a disagreement. I want to know why is there no substantial evidence to support the jury's verdict? There's no substantial evidence to support the jury verdict. Well, which part of the jury verdict? First of all, any of it. Show me your strongest argument for what part. I understand you have a legal argument, so we can address that as well, but just to talk about the substantial evidence part, tell me what your strongest argument is for a position that there was no evidence at all that supported the jury verdict. No evidence. Well, first of all, Your Honor, on the sale of securities, I don't believe that issue should have been submitted to the jury for two reasons. First of all, the claim is that there were sale of unregistered securities to unaccredited investors. As a legal matter, that doesn't apply here because there's an exemption for registration for non-public offerings, and there was nothing public about this transaction. Your position is that's a legal issue or that's still reviewed for substantial evidence? My position is that that is a legal issue based upon the uncontradicted facts here, that there were no aspects at all of this transaction that involved the public. There are contradicted facts, though. There was the size of the offering, the $25 million, the fact that there were two potentially unsophisticated investors, and I don't understand it to be uncontradicted facts. Why is this a legal issue and not one that should have been sent to the jury? Because the statute says that there is an exemption for public offerings, and there must be some public aspect to it. If this transaction could be a public offering, then any transaction could be a public offering. That's not true. I mean, not all transactions are $25 million. No, but there's nothing in the statute that says that the size alone makes something a public offering. It has to be a public offering. It has to be. I think what we're wrestling with is why isn't that a factual issue for a jury to decide? What makes this a pure question of law that should never have gone to the jury? Because I think the... If size matters and we have to determine what big size, small size, what makes it public or not, why is that a legal determination? Because I think when we're interpreting the statute, we have to interpret it according to its plain terms. And there's nothing that says in that statute that something is exempt, not exempt for registration if it's a big transaction. It has to be a public offering. And this was the opposite of... How would you define public offering in a legal way that would preclude this going to a jury? How would I define it? Yeah. I don't know how I would define it, but I would say this was... There has to be some that there was a solicitation to the public, that there was advertisement to the public. What's your best case for that proposition? The best case for that proposition is the case that they cite. It's the... I'm sorry, Your Honor. It's the platform wireless case. There's a limited distribution to highly sophisticated investors rather than a general distribution to the public. It's not a public offering. And that was resolved as a matter of law? That never went to the jury? I don't remember. I don't remember exactly how that was resolved, Your Honor. I think it may have been resolved on summary judgment. But again, no, there was nothing about this transaction that had anything to do with the public. Now, the second point is the accredited investor issue. Here's why contracts, why we believe the language of the contracts are important. The definition of an accredited investor is someone that meets certain financial requirements or the issuer reasonably believes they meet those requirements. And how better could you have for a reasonable belief that you meet the requirements, that an investor meets the requirements when he signs on the dotted line that I meet the requirements? I mean, whether he meets the requirements, the way you phrase that, that just has jury issue written all over it. But there are... So you're not disagreeing. I guess your argument on this one is not that it's a legal issue, but that there's no evidence. The only evidence in there is that he signed on the dotted line. So there's no other conclusion that the jury could have made. There's no other conclusion that jury could reach. But there are also, Your Honor, we cited numerous cases, including two court of appeal decision in highly analogous circumstances, which said that as a matter of law, you can't disclaim your creditor-investor status if you say that in the contract, that the part of the issuer is entitled to rely on what you said in the contract. I take your point, but is that an automatic estoppel? You know, so I get, you know, someone signs the contract and says that they're an accredited investor. Is that the end of the analysis? I mean, I've, again, understood that there are different factors to go into and that there's more nuance involved, but is it your position that that alone is enough to take it out of someone being able to claim it otherwise? I think in this case, it's the end of the analysis. Why is that? Because there is no plausible excuse for their failure to, or for their failure to claim a creditor status. They said, well, we didn't read it or we didn't understand it or something like that, and that is simply not a valid excuse under any law. They knew what a creditor status was. We're talking here about the corporate lawyer, 20-year corporate lawyer who advised them. He knew what a creditor status is when he signed it. The other, Mr. Bond, claimed that he had previously been denied ability to invest in a transaction because he wasn't an accreditor, but here he said he was an accredited investor. So in this specific case, I don't see how, there is an automatic estoppel, I believe. There is, because all the requirements of estoppel are met. There is a false statement. There is no question that the issuer, Mr. Espet, could rely on it. Judge Cronstadt said, well, or the argument was, well, they didn't intend to lie, but there is no requirement of intent. The question is whether the person receiving the statement could reasonably rely, and that's why that statement was in there. What other purpose was there to put that statement in there other than that the issuer, Mr. Espet, could be assured that they were accredited investors? And then they changed their position. This is all the elements of estoppel are met here. And again, it goes back to the basic principle of you sign a contract, you say something, you better have a good reason to disclaim it later, and they don't have a good reason here. I didn't read it. I didn't understand it. It's not a good reason. Now, the second issue was the condition precedent. And this argument is a combination of legal, legal, and precedent. And this argument is a combination of lack of evidence issues. But what happened here was we had a contract that said the MOU, we're going to make payments according to a schedule. There was an amendment. And the only thing the amendment said is we're going to pay a million dollars a month earlier, but everything else remains the same. And then Judge Cronstadt submitted to the jury the question that whether there was a condition precedent based upon an alleged agreement to renegotiate. And the jury found there was. Now, the problem with that, there are many problems with this situation. First of all, California law is not entirely clear on this case. An agreement to negotiate is not enforceable. How can an agreement to negotiate be the basis of a condition precedent if it's not enforceable? It can't. The other California case that discusses this is the Baskin-Robbins case, which precedes Daniels. And it says, well, an agreement to negotiate can be enforceable, but the only thing we're going to protect by agreement to negotiate is the reliance interest. And that's not what happened here. Based upon this alleged agreement to negotiate, the guide statement in reliance, they didn't make the contract in reliance on the agreement to negotiate. The agreement to negotiate happened months after the original contract was signed. So the alleged agreement, the only reliance interest that you could protect in the amendment was we paid a million dollars earlier than the contract required us to do. But the instruction to the jury allowed the guide group to get out of its entire obligation based upon this unenforceable agreement to renegotiate. And the reason agreements to negotiate, there's a question, a serious question under California law, whether those agreements are enforceable, is because there's no basis, and especially in this case, for the jury to determine whether there was compliance or what the remedy should be. Here the alleged agreement to renegotiate was, well, there was an alleged agreement to renegotiate payment schedule based upon sales. Well, what does that mean? Well, the how can any juror, reasonable juror, determine whether that happened? What happened, as in this case, if Mr. Esabat kept making offers and there was no response? Well, as I understand it, the production was delayed and there was some hesitation about what was going on. I mean, the fraud claims are that there were a change in the composition of the ingredients, and so why would it be difficult for a jury to determine whether terms should be, you know, payment should be renegotiated based on how the sales proceed? Why is that impossible for the jury to be able to decipher? What does it mean to say you have to renegotiate an agreement based upon sales? First of all, does it mean you just have to offer to renegotiate or do you have to actually agree? And if that's the case, does that mean that the guide group can keep saying no, no, no, no, no until you go down to zero? I mean, at what point can the jury say, okay, there was an agreement to renegotiate or you complied? What does it mean based upon sales? If sales go down one half, the price goes down one half? Who says that? Where does that come from? Did you want to reserve time for rebuttal? Yes, I do, Your Honor. Okay. Thank you. Good morning. You may have pleased the Court. I'm Chip Childs for the Appellees. I'll go ahead and pick up where my colleague left off on the condition precedent issue. Mr. Essebag himself admitted at record pages 17, 12, and 13 that he and the guide group agreed that he would get an early payment of a million dollars in exchange for negotiating future payments in January of 2018. That's his own testimony. At record page 1798, Mr. Allen, who is either Mr. Essebag's COO or right-hand man, as he was variously described at trial, he testified that the early payment of $1 million was supposed to alleviate future payments until the guide group could start selling and that Mr. Essebag agreed to that. The trial evidence from the guide group were also that the parties agreed that payments beyond the initial $2.5 million investment would come from profits they made from the sales of the Dr. Boost product. Now, Mr. Essebag's brief says that Mr. Whaley admitted that Mr. Essebag never agreed that payments would come from profits, but Mr. Whaley actually testified exactly the opposite at record pages 12, 28, and 29. Whether the parties agreed to the condition precedent requires determining their intent, as a multitude of the cases cited in the briefs make clear, the Colacco case, Starr v. Davis, Mankato, and this Court's decision in Teamsters v. NASA Services. And to address directly the point made in Mr. Essebag's brief that this condition precedent couldn't be enforced because it resulted in a forfeiture, Mr. Essebag didn't suffer a forfeiture. The party's contract was rescinded due to his federal and state securities violations. So Mr. Essebag got all of his shares in ULG back. The guide investors did not get something for nothing. They got nothing for their $3.5 million investment, and they should get their money back. Like in Mankato, the parties here knew their obligations under the agreement, as not only Mr. Essebag admitted and the guide investors explained them, but as Mr. Allen, a third-party witness, explained the agreement. So it's just like the District Court reasoned in its order denying Mr. Essebag's post-judgment motions. Here, the jury could have and did use its common sense, reason, and experience to evaluate whether Mr. Essebag satisfied the condition precedent. Now, Mr. Averitt talked about the Daniels case, but that case is different from our case. That case went up on appeal from a judgment on the pleadings, not after a trial with evidence and testimony from witnesses, and it involved a promise to enter into a loan agreement. That is an agreement to agree. It wasn't an agreement to negotiate based on factors at some time in the future. This court has held in reliance on the Copeland v. Baskin-Robbins case that in California, such agreements to negotiate are enforceable, and Copeland noted that that is the majority rule and said that, in our view, ordinary citizens applying their experience and common sense are very well equipped to determine whether the parties negotiated with each other in good faith. So I'd like to turn now to the issue of materiality, which is on the 25401 claim, the state securities fraud claim, and it's also relevant to the federal legislation that's been addressed. At record page 1636, Mr. Esvag admitted that investors in the Dr. Boost product would want to know what the ingredients in the product were because retailers and consumers would want to know. And then at record pages 1639 and 40, he admitted that he wanted a doctor affiliated with the product because he thought it would increase value. In the Platforms Wireless case, this court held that it is almost certainly the single most important piece of information for an investor deciding to invest in a startup, whether there's a finished, tested product. And in that case, this court reasoned that the defendants couldn't plausibly argue that admitting that the fact that they didn't have a product was not a highly unreasonable omission. So in this case, it's no wonder then that all the guide investors testified that that information was important to them and critical to their investment. And contrary to Mr. Esvag's brief, their testimony was not conclusory. We have cited certain portions of it in our brief, but the record is replete with their talk about their concerns about product credibility and product efficacy. And of course, as this court reasoned in the Miller v. Thain case, Mr. Esvag himself thought that the representations, the information was important or he wouldn't have included it in the first place. And I call the court's attention to the Supreme Court's decision in TSC v. Northway, where the court held that the determination requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him. And these assessments are peculiarly ones for the trier of fact. And the court even went further in a footnote to analogize this situation of the determination of materiality to the reasonable man standard in a negligence case, which the court said similarly is peculiarly an issue for the jury. On the issue of Mr. Esvag's affirmative defense to this claim that the guide investors, as a matter of law, knew the truth about the product, Mr. Allen explained at record pages 1793 and 94 that there were still references in Mr. Esvag's marketing materials to the three scientifically proven premium ingredients as late as August of 2017. Weeks, months after money had changed hands and the MOU had been signed. Weeks, months after Mr. Esvag had scrapped these products because they were banned by anti-doping agencies or uninsurable, he's still referring to them in marketing materials. Every guide investor testified he did not know the truth. And Mr. Allen, again, the third party witness, Mr. Esvag's former COO, confirmed that the guide investors were not told these material facts. And if that's not enough, Mr. Esvag himself admitted it. Consider his testimony at record pages 1644 and 45. I didn't have to tell them anything. He was absolutely defiant about it. He acted insulted that anyone would even challenge him on the point and virtually admitted that he didn't reveal anything because he didn't have to. Now, Mr. Esvag relies on a handful of documents that he says show as a matter of law that the guide group knew the truth. But as the district court meticulously went through each of those documents, none of them says, and certainly not with the clarity required for determination as a matter of law. Now, let me turn then to the Section 5 claim and this, first, this issue of public versus private offering. In this circuit, the Erickson case makes clear that this is a flexible test. But it and Ralston Perina and the Murphy case from this court make clear that really the critical factor is the relationship of the parties. And those cases hold that the issuer must show as to every offeree, every offeree, that that person had access to the kind of information that registration would disclose in order for there to be a private offering. That is really the critical factor. And consider what Erickson said. Such information is available only if, in fact, it is disclosed that the offerees have access to it. That is, there must be a relationship based on factors such as employment, family, or economic bargaining power that enables the offeree effectively to obtain such information. And really, we need look no further than Mr. Bond, one of the guide investors. He was not even understand that he was making an investment that would make him personally liable for millions of dollars. And here is what is critical. Mr. Essebag denied ever talking to him at trial, denied even knowing who he was or selling him securities. And even at trial, after having sued him for millions of dollars, Mr. Essebag from the stand denied even knowing who he was. So there is absolutely no way that this investor had a relationship with the issuers that would have given him automatically, by virtue of that relationship, access to the kind of information that registration would disclose. In his reply brief, Mr. Essebag cites Brown versus Earth Board Sports from the Eastern District of Kentucky for the proposition that the statement in the MOU that the offering was private is somehow binding on all of these investors. As the district court noted, that decision was reversed by the Sixth Circuit. And the federal claim at issue on appeal didn't even confront that issue. Further, the Brown case relied on a deposition admission by the investor that the offering was private. And there is, of course, nothing like that here. And this case, as well, doesn't involve the flexible test that is used in this circuit. Mr. Essebag also argues that there is a stopple as a matter of law based on statements in the MOU. But as the district court recognized, the cases Mr. Essebag relied on do not confront a situation where the issuer knew or reasonably should have known that the purchaser was not trying to say he was an accredited investor. And Rule 506, Federal Regulations Rule 506, is critical here, because that rule gives several examples of ways that an issuer can go about determining accreditation. They all involve looking at financial information from the investor or relying on a statement from a professional, like a lawyer or an investment advisor or an accountant who himself clearly has looked at financial information and made the determination. The only instance provided in the rule where merely relying on a statement of accreditation by the investor works is when the issuer has previously made a determination of accreditation that is satisfactory under the rule. So that obviously had not happened here. And that being the case, a mere boilerplate statement in an MOU signed by people you don't even know cannot satisfy the standard. Now, my understanding is that rule was promulgated in September 2013. Most of the cases on which that, the one circuit court case that's after is Scott. That's the third circuit case. That's an unpublished decision that is, like the other cases, distinguishable on their facts. Now, Mr. Hatch and Mr. Bond, the two investors here who are indisputably unaccredited, explained why they did not intend that the statement in the MOU be relied on. And we can get into it as necessary, but as to Mr. Hatch, this investment began, the investor was supposed to be a limited liability company, the guide group, which was an accredited investor. And so Mr. Hatch testified when that was the case and he saw the provision in the agreement, he thought nothing of it. But because United Licensing Group was an S corporation and Mr. Essebag needed the tax advantage, the investors were changed to all these individuals. And this issue never surfaced again. As to Mr. Bond, of course he wasn't involved in the negotiations he testified. He didn't even know it was in there. And the district judge who presided over the trial, not only concluded that there was substantial evidence to support the jury's verdict on estoppel, but he characterized their testimony as persuasive in ruling on post-trial motions at record page 28. And of course, the jury was also free to conclude that Mr. Essebag, in fact, did not rely on these statements in the MOU. He never asked these investors for any financial information. And the truth is, as he admitted at record page 1741, he only cared about Justin Whaley and Ron Whaley. As he cared about the investigators, he characterized that these are the people I was doing business with. Those two, not the others. But he purported to sell securities to the others, and then he sued them for millions and millions of dollars. So Scott, Wright, UBS, Goodwin Properties, these cases all involved responsible issuers who took significant steps to ensure the protection of investors. In most of these cases, there is no dispute that the investors were, in fact, accredited, and the issuers were dealing with people personally and directly who filled out financial information and held themselves out as sophisticated, wealthy investors. All of these cases are distinguishable on their facts, in addition to the fact that the rule tells us that you can only rely on a statement when you've previously made a determination of accreditation. And let me just address briefly the argument that the district judge abused his discretion by asking Mr. Essebag's counsel not simply to read from exhibits. Now we are talking about four instances identified by Mr. Essebag's brief during an eight-day trial. In other situations, for example, at record pages 1179 and 1182, Mr. Essebag's lawyer was allowed to read from exhibits during witness examination. But just briefly, the example at record page 83, this was lengthy reading of several sentences from an email, and the judge asked counsel, and of course the email was being published, just ask questions please, don't read lengthy passages. Record page 93, the exhibit was being published for the jury, it didn't have to be read. At page 97, counsel was noting language in a document, not asking a question. And then finally, at 104, the district judge just asked counsel to ask, not to ask whether an admitted exhibit just says things, but ask him what he knows and, if appropriate, use the document to refresh recollection. The judge said, I'm not saying the evidence can't come in. Counsel just needed to ask questions. So, in conclusion, Section 7 of the MOU said that if the guide investors missed a required payment, Mr. Essebag could pay $25, each of the $3.5 million he had already received, and get all of his shares back. Mr. Essebag did not attempt to take advantage of that provision. Instead, he sued for $21.5 million more for a worthless investment that he marketed and sold in violation of state and federal securities laws. The jury was well within its province to evaluate the evidence, judge the credibility of the witnesses, and reject all of Mr. Essebag's arguments. And the district judge properly denied his post-trial motions. This court should summarily affirm the judgment based on the well-reasoned decisions of the district court. Thank you. Thank you, counsel. We have some time for rebuttal. Thank you, Your Honor. Briefly, Daniels says, under controlling California law, preliminary negotiations or agreements for future negotiations, so-called agreements to agree, are not enforceable contracts. That's exactly the agreement here that gave rise to the alleged condition precedent. It's not enforceable as a matter of law. Mr. Childs talked about some evidence from Mr. Allen. That evidence related to supposed negotiations when the MOU was first signed. It was part of the claim by the guide group that Mr. Essebag fraudulently promised that despite what the MOU said, sales would determine how much they would pay. The jury rejected that claim. So there is no evidence whatsoever from which a jury could find here whether an agreement to negotiate was breached or not. Third, I like settlement discussions, showing that there was, in fact, an attempt to renegotiate. In terms of the Section 5 claim, the unregistered securities, there is no distinction, no substantive distinction between the cases we cited and this case. Mr. Childs said that all those cases involved responsible issuers who made an attempt to determine the financial wherewithal of the investor. Scott, the Third Circuit's decision involved an investor who was a 13-year-old girl, and the Court of Appeals said she signed. They can't claim that she's an unaccredited investor. In terms of the evidence concerning the alleged fraud, there was no alleged fraud. They knew, according to their own documents, that this formula that was told to them four months ago was no longer the formula. Their own documents state there's a new formula guy, there's a new formula. They were told in documents what the ingredients were. This is all before the MOU was signed. There's not one whiff of any evidence, any communication internal or external from the time that they first saw anything having to do with Dr. Boos until two years after the lawsuit was filed of any concern on their part about the formula. Nothing. They didn't rely on it. It wasn't material to them. They liked the idea. They thought it was a great idea. That's why they bought in. They thought they could sell it to Walmart. They found out after they signed the deal that they couldn't, so they backed out, and then two years later they came up with some alleged fraud. They didn't care about it at all. There's no substantial evidence, no substantial evidence at all. The only evidence we had at trial of any alleged reliance or materiality was self-serving, uncorroborated testimony from six or seven members of the guide group who said, no, they never told me it was false. And then when counsel tried to ask them about documents showing that it was false, the district court said, you can't read from it. How are you supposed to cross-examine the witness? That's what the prejudice was. Thank you very much. Thank you, counsel. Thank you for your arguments in this case. The case is now submitted, and that concludes our arguments for the week, and the court's in recess. All rise. This court for this session stands adjourned.
judges: NELSON, VANDYKE, SANCHEZ